**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:09-cr-00055

BENJAMIN TOD CARTER,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

      Pending before the court are the defendant's Motion to Dismiss [Docket 16] and Motion to Suppress Statements and Evidence [Docket 18].[1]  Both parties briefed the pending motions prior to the pre-trial motions hearing I held on June 18, 2009.  At that hearing, I heard testimony from two of the officers involved in the defendant's arrest and a detective who interacted with the defendant at the police station.  Due to the various statements and evidence that the defendant seeks to suppress, I ordered the parties to file memoranda after the hearing to clarify the issues presented.  Those briefs have now been filed and the motions are ripe for review.  For the reasons explained below, the defendant's Motion to Dismiss is **DENIED** and the defendant's Motion to Suppress is **GRANTED in part** and **DENIED in part**.

---

[1]     Also pending is the United States' Motion to Withdraw Motion to Seal and all attachments thereto [Docket 23].  That motion is hereby **GRANTED**.

**I. Background**

        The defendant, Benjamin Tod Carter, answered a knock at his door on August 1, 2008 to find

Charleston Police Officers Webb, Morris, and Burford in uniform, performing what is known as a

knock and talk.  (Mot. Hr'g Tr. 31 [Docket 35].)  The officers were responding to reports of drug

activity in the neighborhood and had just completed a knock and talk at the other apartment in the

duplex.  (*Id.* at 32.)  Officer Webb told the defendant that the police department had heard

complaints about drug activity at this address. (*Id.*)  Almost immediately, the defendant's neighbor,

standing behind the officers, told him that the police just searched their apartment.  (*Id.*)  The

defendant's apartment is on the top level of the duplex; it is entered on the main floor but then, after

passing a small landing, one must climb up the stairs immediately upon entry.  (*Id.* at 33-36; 68.)

Officer Webb and the defendant spoke briefly about drug activity on the entryway landing, while

the defendant questioned why the officers showed up at his apartment.  (*Id.* at 33.)  The defendant

gave Officer Webb his name upon request and Officer Webb asked if he had identification.  (*Id.*)

        Just before the defendant went upstairs to retrieve his identification, Officer Webb asked if

the officers could step inside the doorway and received permission to do so from the defendant.  (*Id.*)

While standing on the landing waiting for the defendant to return, the officers determined that there

was an officer safety issue due to the "fatal funnel" created by the officers' location at the bottom

of the stairway while the defendant was in the area around the top of the stairway.  (*Id.* at 34-35.)

At that point, Officer Webb yelled for the defendant and began walking up the stairs.  (*Id.* at 35-36.)

The defendant responded when Officer Webb was about halfway up the stairs.  (*Id.*)  Officer Webb

then briefly explained his concern that the defendant may have been retrieving a gun when he was

about three-fourths of the way up the stairs.  (*Id.*)  In response, the defendant "put his hands up like,

-2-

[and said, ']no, no, no['] as if, 'No, I'm not getting a weapon.'" (*Id.* at 36.)  Officer Webb then asked if he could step to the top of the stairs and he testified that he received permission to do so. (*Id.*)  During cross examination, the defendant's counsel posited that the "no, no, no" statement was a response to Officer Webb's request for permission to come up the stairs and not a response to whether or not he was getting a gun.  (*Id.* at 75-76.)

Once at the top of the stairs, Officer Webb was inside the main living area of the defendant's apartment.  (*Id.* at 37.)  Officer Webb then observed another person, Mr. Green, sitting in the apartment and received permission from the defendant to ask Mr. Green a few questions.  (*Id.* at 39-40.)  At that point, Officer Burford asked if he and Officer Morris could come upstairs as well and Officer Webb testified that the defendant's response was affirmative.  (*Id.* at 40.)  With all the officers upstairs, Officer Webb again attempted to explain what the officers were looking for and why they wanted permission to search the defendant's apartment.  (*Id.* at 41-42.) Officer Webb then testified that the defendant gave the officers permission to look around.  (*Id.* at 42.)

Thereafter, Officers Morris and Burford pulled back a curtain separating the defendant's bedroom from a common area in the apartment and went inside the bedroom with the defendant. (*Id.* at 62-63.)  Officers Morris and Burford smelled burnt marijuana immediately upon entering the defendant's bedroom.  (*Id.* at 94.)  Upon questioning, the defendant told the officers that he had smoked marijuana just prior to their arrival at his apartment.  (*Id.* at 95.)  The defendant then admitted in response to questioning that there was more marijuana in the closet.  (*Id.* at 95-96.) Officer Morris retrieved the marijuana and later testified that at this point the defendant was not free to leave.  (*Id.* at 109.)  In response to additional questioning, the defendant admitted to having two handguns in separate shoe boxes inside his closet.  (*Id.* at 96-97.)  Officer Morris then retrieved the

shoe boxes with the handguns from the defendant's closet and asked the defendant to step outside of the bedroom.  (*Id.* at 95-98.)  The defendant was then arrested and handcuffed for his transportation to the police station.  (*Id.* at 99-100.)  The officers told the defendant he was under arrest for distribution of marijuana, to which he repeatedly responded that he did not sell marijuana, but only smoked it and had done so since he was fifteen years old.  (*Id.* at 100.)

When the defendant arrived back at the police station, he was placed in a holding cell that adjoins an evidence processing room.  (*Id.* at 100-01.) Detective Taylor then walked by the evidence processing room, heard that the defendant was arrested for distribution of marijuana, and saw the drugs and the firearms on the table.  In response to the officers' conversation about charging the defendant with possession with intent to distribute marijuana, the defendant stated again that he did not sell marijuana, but only smoked it and was addicted to it.  (*Id.* at 101-02, 116-17.)  Detective Taylor then walked up to the defendant and asked him to say again what he said previously, to which the defendant replied, "I don't sell weed.  I smoke weed."  (*Id.* at 116-17.)  Detective Taylor then said, "[D]o you want to give a statement to that? . . . Do you want to give your, your side of it?" and handed him a statement form.  (*Id.* at 117.)  Detective Taylor then handed the defendant a pen and left the room while the defendant filled out the statement form.  (*Id.* at 120-21.)  After retrieving the completed form, Detective Taylor handed the form back to Officers Webb, Morris, and Burford. (*Id.* at 122-24.) On cross examination, Detective Taylor stated that he knew that the facts of the case and that the defendant's statements could support a federal prosecution under the drug user in possession of a firearm statute.  (*Id.* at 129-30.)

At no point during the interaction between the defendant and the officers was the defendant read his *Miranda* rights.  (*See id.* at 69-70, 108-13, 125-26.)  The officers did not obtain any written

consent to search the defendant's apartment, despite the fact that the forms are often used. (*See id.*) The officers also did not obtain a written *Miranda* waiver at either the defendant's apartment or at the police station, even though the Charleston Police Department often uses written *Miranda* waiver forms. (*See id.*) Furthermore, Detective Taylor did not *Mirandize* the defendant at any point. (*Id.* at 125-26.)

The defendant was indicted on March 13, 2009 and Officer Morris served the federal arrest warrant on the defendant on that date. (*Id.* at 104.) Officer Morris arrested the defendant at his home, read him his *Miranda* rights at that time, and transported him to the courthouse. (*Id.* at 107.) Officer Morris videotaped his conversation with the defendant in the car. (*Id.* at 105.) The video tape shows Officer Morris asking the defendant whether he sells drugs and the defendant replying in a manner consistent with his previous statements that he does not sell drugs, but only uses drugs. (*See* Government Ex. 5.)

## II.  Motion to Dismiss

The defendant moves to dismiss the Indictment on the grounds that the statute violates his right to bear arms as guaranteed by the Second Amendment. The Second Amendment to the United States Constitution reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. That amendment was the subject of the Supreme Court's detailed analysis in *District of Columbia v. Heller.* 128 S. Ct. 2783 (2008). My colleague Judge Copenhaver already decided a case involving the same statutory offense and the precise arguments that the defendant raises in this case. *See United States v. Chafin*, No. 2:08-cr-00129, 2008 WL 4951028 (S.D. W. Va. Nov. 18, 2008); *see*

*also United States v. Bumm*, No. 2:08-cr-00158, 2009 WL 1073659 (S.D. W. Va. April 17, 2009)

(adopting Judge Copenhaver's decision in *Chafin*).

Judge Copenhaver noted that the *Heller* Court "was presented only with the question of 'whether a District of Columbia prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution.'" *Chafin*, 2008 WL 4951028, at *2 (quoting *Heller*, 128 S. Ct. at 2787-88). Judge Copenhaver stated that it is now "settled that the Second Amendment 'guarantee[s] . . . the individual right to possess and carry weapons in case of confrontation.'" *Id.* (quoting *Heller*, 128 S. Ct. at 2797, 2799). "Equally apparent is the notion that the individual right is 'not unlimited, just as the First Amendment's right of free speech . . . [is] not' unlimited." *Id.* (quoting *Heller*, 128 S. Ct. at 2799). As Judge Copenhaver pointed out, the Supreme Court specifically observed:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on *carrying concealed weapons* were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the *possession of firearms by felons* and *the mentally ill,* or laws forbidding the *carrying of firearms in sensitive places such as schools and government buildings,* or laws *imposing conditions and qualifications on the commercial sale of arms.*

*Id.* (emphasis in original) (quoting *Heller*, 128 S. Ct. at 2816-17 (citations omitted)). "The Supreme Court stressed that these underscored, significant carve outs were 'presumptively lawful regulatory measures' that were 'examples[,]' rather than an 'exhaustive' listing, of legitimate prohibitions." *Id.* (quoting *Heller*, 128 S. Ct. at 2817 n.26).

In light of the above quoted portions of *Heller*, Judge Copenhaver concluded that the reading given to *Heller* by the defendant is too broad for at least two reasons:

> First, the Supreme Court addressed only the constitutionality of a sweeping District of Columbia firearm regulation—one that included a total ban on handguns—that was far more restrictive than [18 U.S.C. § 922(g)(3)].  Second, *Heller* sanctioned some well-rooted, public-safety-based exceptions to the Second Amendment right that appear consistent with Congress' determination that those unlawfully using or addicted to controlled substances should not have firearms at the ready.

*Id.*  Furthermore, Judge Copenhaver found that statutory restrictions of the Second Amendment did not have to satisfy strict scrutiny, but he did not reach the issue of what type of judicial review should be applied under *Heller*.  *See id.* (quoting the dissent in *Heller* in emphasizing that "the majority implicitly, and appropriately, reject[ed strict scrutiny] by broadly approving a set of laws—prohibitions on firearms in certain locales, and government regulation of commercial firearm sales—whose constitutionality under a strict scrutiny standard would be far from clear").  I adopt Judge Copenhaver's reasoning.  The statute challenged in this case is far less restrictive than the laws held unconstitutional in *Heller* and is consistent with the safety based exceptions recognized in that case.  Accordingly, I **FIND** that the statute is not unconstitutional and the Motion to Dismiss [Docket 16] is **DENIED**.

## III.  Motion to Suppress Statements and Evidence

The defendant also moved to suppress six different categories of evidence.  I will address each category of evidence individually.

### A.  Evidence Seized During Search of the Defendant's Apartment

The defendant argues that the evidence seized during the search of his apartment should be suppressed because the entry and search of his apartment was unlawful.  The officers clearly did not have a search warrant to enter the apartment, but they instead testified that the defendant consented

to the search of his apartment.  A defendant's consent to a search provides a longstanding exception to the warrant requirement.  *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  The defendant asserts that he resisted the officers' search request and that the evidence does not prove that he consented to the search.  The defendant further argues that if I conclude that he consented to the search, I must still suppress the evidence because the consent was not voluntary or intelligent.

The defendant asks me to reject the officers' characterization of the events because the audio tape of the interaction does not clearly contain any verbal consent to search the apartment.  While I agree with the defendant that the audio evidence does not provide much assistance in determining what happened at the defendant's apartment, I cannot agree that the audio shows that the defendant did not consent to the search.  I could not tell from the audio tape whether the defendant refused to consent or readily consented to the search because the quality of the recording was so poor.  Without much assistance from the audio tape, I rely primarily on the credible testimony of the officers.

At the outset, I note that the defendant clearly voluntarily consented to the officers' request to stand inside the door, at the bottom of the stairs, while he retrieved his identification.  The defendant took longer to retrieve his identification than the officers expected.  Furthermore, the officers realized that standing at the bottom of a stairway when a potential drug dealer was at the top of the stairs put them in a vulnerable position if the defendant came back to the stairway with a firearm.  Officer Webb yelled for the defendant and received no response.  Rather than retreating and breaking off contact with the defendant, Officer Webb began walking up the stairs and continued calling out for the defendant.  I **FIND** that this brief advancement was appropriate because of the officer safety concerns with remaining at the bottom of the "fatal funnel."  In addition, I **FIND** that the defendant's constitutional rights were not violated by Officer Webb's actions, in particular

because Officer Webb immediately received permission from the defendant to be part of the way up the stairs.

The audio tape also clearly picks up the defendant saying "no, no, no, no" to Officer Webb when he returns from retrieving his identification. The audio is not helpful, however, in determining exactly what the defendant was responding too. The defendant argues that his response could have been signaling that he did not want the officers to come up the stairs. On the other hand, Officer Webb testified that the defendant was responding to the officer's explanation that he climbed up the stairs because he was concerned that the defendant may be getting a gun. In other words, Officer Webb interpreted the statement as unequivocally denying that he was going to get a firearm. The next portions of the interaction between the officers and the defendant support Officer Webb's testimony. Specifically, the defendant stated that he did not care if Officer Webb asked his guest questions and that he did not mind if the other officers came up to the top of the stairs. Accordingly, I **FIND** that the defendant's statement was not in reference to whether the officers could come into his apartment and that the officer's obtained proper consent to be upstairs in the apartment.

Thereafter, Officer Webb testified that he and the defendant discussed again why the officers were there and why they wanted to look around. Officer Webb asked if they could look around a couple of times, to which the defendant stated that he had not lived in the apartment very long and that there was not much to look around at. Officer Webb testified that after a little more discussion, the defendant gave his permission to the officers to look around. Although I could not hear the defendant grant permission on the audio tape, I give credit to Officer Webb's testimony that the

defendant did in fact give permission.[2]  Furthermore, I note that both Officers Webb and Morris

testified that the defendant never limited or revoked his consent.

The defendant argues that his consent was not voluntary or intelligent, but at best was "some

form of implied acquiescence to the officers show of authority and persistent requests to search the

apartment. . . ." (Def.'s Post-Hr'g Mem. Supp. Mot. Suppress 2 [Docket 36].)  The defendant relies

primarily on the facts that there were three officers present, in uniform, with firearms, and in marked

vehicles that were visible to the defendant's community.  (*Id.* at 3.)  The defendant further points

out that Officer Webb did not tell the defendant he could refuse the request to search, that the

officers did not get a written consent to search, and that the "officers went to the two apartments

with the intention of making entry and searching them [without warrants]."  (*Id.* at 4.)

In *United States v. Elie*, the Fourth Circuit noted the factors a court should consider when

determining whether consent to search was voluntary under the totality of the circumstances:

> [I]t is appropriate to consider the characteristics of the accused (such as age,
> maturity, education, intelligence, and experience) as well as the conditions under
> which the consent to search was given (such as the officer's conduct; the number of
> officers present; and the duration, location, and time of the encounter).

111 F.3d 1135, 1144 (4th Cir. 1997).  In this case, the *Elie* factors lean clearly toward a finding that

the consent was voluntary.  For example, there are no known characteristics of the defendant, such

as age, maturity, education, intelligence, and experience, that would lead me to believe his consent

was involuntary.  Furthermore, the interaction with the officers happened inside the defendant's

home, during the day, and lasted under five minutes from beginning to end, all of which do not raise

---

[2]        In his post-hearing reply, the defendant argues extensively as to why I should not
credit the officers' testimony with respect to the defendant's consent to search and other matters
before this court.  I assessed the credibility of the officers during the hearing and have no reason to
disregard their testimony.  Accordingly, I reject the defendant's arguments on this point.

any serious questions about voluntariness.  In addition, I do not see serious problems with the officers conduct during the knock and talk, as they obtained consent without using any sort of physical intimidation and clearly explained why they were at the apartment and what they wanted to look for in the apartment.  The officers' conduct does not rise to the level that would make the consent involuntary, especially since "[n]either the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself."  *Elie*, 111 F.3d at 1145-46 (internal quotations omitted).[3]  Similarly, while the defendant relies on the number of officers present (three) as evidence that the statement was involuntary, I cannot find that this would make the defendant's otherwise voluntary consent involuntary.  Taking into consideration the totality of the circumstances, I **FIND** that the defendant voluntarily and intelligently consented to the search of his apartment.[4]  Accordingly, the defendant's Motion to Suppress is **DENIED as to this evidence**.

### B. Evidence that the Officers Smelled Anything Suggesting the Presence of Marijuana

The defendant also argues that any evidence that the officers smelled anything suggesting the presence of marijuana should be suppressed because it is fruit of an illegal entry into and search

---

[3]     The defendant correctly argues that mere acquiescence is not enough to find voluntary consent, but the defendant did much more than simply acquiesce in this case.  For example, a defendant's argument of acquiescence was rejected by the Fourth Circuit in *United States v. Smith* where it held that "[t]he officers involved in this search did nothing to indicate that Smith would be harmed if he did not consent" and the court found that the defendant consented even where he only left a car door unlocked, appeared cooperative, and never verbally stated that the officers could search his car.  *See generally* 30 F.3d 568, 570-72 (4th Cir. 1994).

[4]     The defendant argues that the evidence obtained in this search should be suppressed to discourage the officers' conduct in obtaining consent.  The defendant further argues that the officers' conduct has the effect of eroding the privacy rights that the Fourth Amendment was designed to protect.  But, having found that there was no Fourth Amendment violation as defined by the binding precedent in this circuit, I find there is no conduct to discourage.

of the defendant's home.  Because I held above that the defendant voluntarily and intelligently consented to the search of his apartment, the defendant's Motion to Suppress is **DENIED as to this evidence**.

### C.  Any Inculpatory Statements by the Defendant in his Apartment

The defendant next argues that any inculpatory statements made inside his apartment should also be suppressed as fruit of the illegal entry into and search of his apartment.  Because I held above that the defendant voluntarily and intelligently consented to the search of his apartment, the defendant's Motion to Suppress is **DENIED as to this evidence**.[5]

### D.  Oral Inculpatory Statements by the Defendant in the Holding Cell

The defendant next argues that oral statements he made while in the holding cell should be suppressed because the officers failed to read him his *Miranda* rights.  The defendant asserts that by discussing his case within earshot of the holding cell, the officers "prompted, provoked and baited [the defendant's] assertion that he 'did not sell weed, I only smoke it.'" (Def.'s Post-Hr'g Mem. Supp. Mot. Suppress 6.)  In order for the court to find a *Miranda* violation under these circumstances, the defendant must have been subject to custodial interrogation without having been read his rights.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and are not inadmissible under *Miranda*.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  In *Innis*, the Supreme Court held that "the term

---

[5]      I note that the defendant did not seek to suppress the inculpatory statements due to the lack of a reading of his *Miranda* rights, likely because those rights only apply when a defendant is in custodial interrogation and it was only after the incriminating evidence was obtained that the defendant was placed under arrest.  As the Western District of New York held, interrogation in the familiar surroundings of one's own home is generally not deemed custodial for purposes of *Miranda*.  *United States v. Plugh*, 522 F. Supp. 2d 481, 490-91 (W.D.N.Y. 2007).

'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.  The Court then concluded that two officers,  who were speculating in the defendant's presence, about what may happen if a child found a sawed-off shotgun used in a murder, should not have known that it would elicit an incriminating response.  *Id.* at 302-03.  "[T]he respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him."  *Id.* at 303.

The reasoning used by the Supreme Court in *Innis* is equally applicable to the case at hand. In this case, the defendant was in a holding cell when Detective Taylor and the arresting officers had a brief discussion in an adjoining room regarding the nature of the defendant's arrest and the possible charge against him—possession of marijuana with intent to distribute.  In response, the defendant asserted that he did not sell weed, but only smoked weed.  As the *Innis* Court stated:

> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the [defendant] would suddenly be moved to make a self-incriminating response.  Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that [the defendant] would so respond.

*Id.*  Similarly, I cannot find that merely informing a detective of the charges that may potentially be brought against a suspect is enough to find that the officers should have known it would elicit an incriminating response from the defendant, who was in an adjacent room.  Instead, I **FIND** that the defendant's statements while in the holding cell were voluntary and admissible.  Accordingly, the defendant's Motion to Suppress is **DENIED as to this evidence**.

**E.  Written Statement by the Defendant Obtained by Detective Taylor**

The defendant also seeks to suppress a written statement he made while in the holding cell. Though the defendant was in custody and had not been *Mirandized* when he made his oral and written statements, there is a critical distinction between the two statements.  Specifically, while the oral statements were volunteered in response to a discussion between officers merely within earshot of the defendant, the written statement was given in response to Detective Taylor's interrogation of the defendant.  Detective Taylor had just overheard the defendant stating that he did not sell marijuana, but smoked it.  Detective Taylor, having full knowledge of the ability to charge the defendant with being a drug user in possession of a firearm in federal court, approached the defendant and asked him to repeat himself and then asked him to put it on paper.

The government argues that Detective Taylor's interaction with the defendant was "so unlike interrogation" because the Detective did not make threats, promises, or encouragement, and it was further evidenced by the fact that the defendant indicated on the statement form that he was a victim and not a suspect.  The government further relied on the fact that Detective Taylor was not present when the defendant filled out the form.  All these arguments have little bearing on the test used to determine whether someone was interrogated under *Miranda*.  As noted above, the *Innis* Court held that interrogation includes much more than express questioning, "but also . . . *any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.*"  *Id.* at 301 (emphasis added).  Detective Taylor's words and actions—getting a statement form and asking the defendant to write down the incriminating statement he had just volunteered—are quite clearly reasonably likely to elicit an incriminating response.  In fact, Detective Taylor knew that the volunteered statement was incriminating and

attempted to get the statement in writing in order to have an easier case against the defendant—it was more than "reasonably likely" to elicit an incriminating response, it was sure to elicit such a response.[6]  I **FIND**, therefore, that Detective Taylor's words and actions constituted interrogation for purposes of *Miranda*.  Accordingly, the defendant's Motion to Suppress is **GRANTED as to this evidence** and the written statement is **ORDERED** suppressed.

### F.  Statements by the Defendant to Officer Morris After the March 2009 Indictment

Finally, the defendant also seeks to suppress statements he made on March 13, 2009 while Officer Morris transported him on the day of his Indictment in this case.  During the transport, the defendant asserted yet again that he does not sell marijuana, but is merely a user.  The defendant challenges these statements on two grounds: (1) that Officer Morris never read the defendant his *Miranda* rights before the transport; and (2) that the defendant's statements are fruit of the poisonous tree from the earlier oral and written statements obtained.

First, Officer Morris testified that he read the defendant his *Miranda* rights on March 13, 2009 before he transported the defendant.  (Mot. Hr'g Tr. at 107.)  In making the argument that he was not read his *Miranda* rights, the defendant relies solely on the fact that there was no written *Miranda* waiver and that the video played in court did not show the officer read the *Miranda* rights. The defendant offered no evidence or argument that he was not read his *Miranda* rights before being transported on March 13, 2009, but merely asks the court to reject Officer Morris's testimony.  I credit the testimony of Officer Morris.  I **FIND** that Officer Morris read the defendant his *Miranda*

---

[6]      Of course, such words and actions would not be a problem if an officer had simply read the defendant his *Miranda* rights and there was no way for Detective Taylor to know that the defendant had not been read his *Miranda* rights.

rights before transporting him and therefore reject the defendant's first argument with respect to this evidence.

Second, the defendant asserts that the statements should be suppressed under the fruit of the poisonous tree doctrine.  Because I held above that the search of the defendant's property and the defendant's oral statements made in the holding cell should not be suppressed, this argument has no real chance for success.  The only evidence that I ordered suppressed was the written statement and I cannot conjure up any argument that would find these oral statements to be suppressible fruit of the written statement's poisonous tree.  Accordingly, this argument is rejected and the defendant's Motion to Suppress is **DENIED as to this evidence**.

## IV.  Conclusion

For the reasons detailed above, the defendant's Motion to Dismiss is **DENIED**. Furthermore, the defendant's Motion to Suppress Statements and Evidence is **GRANTED in part** and **DENIED in part**.  Specifically, the motion is **GRANTED** with respect to the written statement made by the defendant while inside the holding cell, but it is **DENIED** with respect to all other challenged evidence.  Accordingly, the written statement alone is **ORDERED** suppressed.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        July 13, 2009

Joseph R. Goodwin, Chief Judge

-16-