```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                   AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                              CRIMINAL ACTION NO. 2:09-00055

**BENJAMIN TOD CARTER**


<u>MEMORANDUM OPINION AND ORDER</u>

     This case is before the court following the Judgment of the court of appeals entered January 23, 2012.  The issue for consideration is whether defendant Benjamin Tod Carter's conviction for possessing a firearm while being an unlawful user of marijuana in violation of 18 U.S.C. § 922(g)(3) works a deprivation of the rights guaranteed him under the Second Amendment.

     The court of appeals has concluded that intermediate scrutiny is the appropriate standard for application in a case such as this.  As a consequence, the United States must demonstrate by evidence that there exists "a reasonable fit between the challenged regulation and a substantial government objective."  <u>United States v. Carter</u>, 669 F.3d 411, 417 (4th Cir. 2012) (internal quotation marks omitted) (quoting <u>United</u>

States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010), which in turn quoted Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)).

I.

After receiving complaints of suspected drug activity at a two-unit apartment building where defendant Benjamin Tod Carter was living at the time, law enforcement investigated the complex. They knocked on doors and spoke with those who answered. They found evidence of marijuana use in the first unit.

Law enforcement then knocked on Mr. Carter's door. He permitted them to enter his unit. The officers smelled marijuana. During questioning, Mr. Carter admitted that he had been using marijuana for 15 years.[1] During an ensuing search, the officers found 12 grams of loose marijuana, 15 grams of partially smoked blunts, a digital scale, $1,000 in larger bills, and $122 in smaller denominations.

---

[1] In Mr. Carter's brief filed on remand, he appears to concede that he qualifies as a "habitual user of marijuana." (Def.'s Post-Rem. Br. at 7).

Mr. Carter also admitted that he had two firearms in his closet -- a semi-automatic pistol and a revolver. He asserted that he bought the firearms a week earlier as a self-defense measure for himself and his nephew, a fellow household member, asserting that they lived in "a bad neighborhood."

On March 3, 2009, the grand jury returned a one-count indictment alleging Mr. Carter possessed the pistol and revolver while he was an unlawful user of and addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)3). On April 23, 2009, Mr. Carter moved to dismiss, alleging, <u>inter alia</u>, that section 922(g)(3) was unconstitutional, both facially and as applied to him, in light of <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008).

The presiding district judge denied the motion to dismiss, after which Mr. Carter entered a conditional guilty plea on August 11, 2009. The plea agreement reserved his right to appeal the denial of his motion to dismiss. On November 2, 2009, the Judgment was entered sentencing Mr. Carter to a three-year term of probation. On November 12, 2009, Mr. Carter noticed his appeal of the Judgment, preserving only the challenges he made to section 922(g)(3).

On January 23, 2012, the court of appeals vacated the Judgment. The contents of the panel opinion are discussed more fully infra. On February 14, 2012, the mandate remanding the case arrived. The case was then reassigned to the undersigned judge.

On April 17, 2012, the court set a hearing for May 23, 2012, in order to establish a schedule for further proceedings consistent with the mandate. On June 5, 2012, the court set a briefing schedule culminating in an August 15, 2012, hearing. A portion of the briefing schedule, and the August 15, 2012, hearing date, were rescheduled by orders entered July 24, August 17, and September 19, 2012, at Mr. Carter's request.

Following conclusion of the briefing schedule, during which time the United States filed its "Supplemental Sentencing Memorandum" on June 22, 2012, and Mr. Carter filed his "Post-Remand Briefing" on October 4, 2012, the court held a hearing on October 25, 2012, with Mr. Carter present. The court on that occasion received into evidence by agreement of the parties those exhibits attached to their respective briefs filed in this action following receipt of the mandate. On October 26, 2012, the court entered an order allowing the United States to file three additional items of evidence. The United States filed those three additional items on November 2, 2012. Mr. Carter

4

was given leave to respond thereto by November 16, 2012.  His response was received that date.

On November 20, 2012, counsel for both parties disclosed during a brief teleconference that they did not wish to submit any further briefing or evidence in support of their respective positions.  The court, accordingly, deems the matter submitted for a decision.

II.

A.     The Governing Standard

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend 2.  In Heller, the Supreme Court concluded "that the Second Amendment conferred an individual right to keep and bear arms."  Id. at 595.  The majority opinion added, however, that "the right was not unlimited, just as the First Amendment's right of free speech was not . . . ."  Id. at 626.

The decision in United States v. Chester, 628 F.3d 673 (4th Cir.2010), prescribes "a two-part approach to Second Amendment claims" under Heller:

> The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. Heller left open the issue of the standard of review, rejecting only rational-basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

Chester, 628 F.3d at 680 (citations omitted); Carter, 669 F.3d at 416-17.

The court of appeals' opinion in this case clarified several matters.[2] First, the panel assumed a favorable answer for Mr. Carter respecting the first question above, namely, that

---

[2] Our court of appeals strictly applies the mandate rule. Two components of the multifaceted rule have application here. First, a district court is generally "bound to carry the mandate of the upper court into execution and may not consider the questions which the mandate laid at rest." United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993) (internal quotation marks and brackets omitted). Second, the rule intervenes to preclude "a remand proceeding [from becoming an] occasion for raising new arguments or legal theories." Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 481 (4th Cir. 2007).

section 922(g)(3) imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  Second, the court of appeals isolated the precise inquiry to be made as to the second question above: "[T]he government bears the burden of demonstrating (1) that it has an important governmental 'end' or 'interest' and (2) that the end or interest is substantially served by enforcement of the regulation."  Carter, 669 F.3d at 417.  Third, the panel decision concluded that the United States had shown that section 922(g)(3) served an important governmental interest.  See id. at 417 (noting, "[T]he government's interest in 'protecting the community from crime' by keeping guns out of the hands of dangerous persons is an important governmental interest.") (quoting, in part, Schall v. Martin, 467 U.S. 253, 264 (1984)); see also id. at 415 ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous.").

The only question remaining under the mandate, then, is whether the identified important governmental interest is substantially served by enforcing section 922(g)(3).  The panel observed that there is no precise formula the United States need follow in making the required showing:

7

> [W]hile the government must carry its burden to establish the fit between a regulation and a governmental interest, it may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require.

Carter, 669 F.3d at 418.

B.   Analysis

As noted, the precise question is whether the enforcement of section 922(g)(3) substantially serves the United States' undeniably important interest in protecting the community from crime by keeping guns out of the hands of dangerous persons. In making that determination, several considerations come into play. First, "intermediate scrutiny has never been held to require a perfect end-means fit." United States v. Mahin, 668 F.3d 119, 127-28 (4th Cir. 2012); Chester, 628 F.3d at 683 ("Intermediate scrutiny requires the government to demonstrate that the statute at issue has a 'reasonable fit' with an important government interest."); Carter, 669 F.3d at 417 (same).

Second, the text and reach of section 922(g)(3) is relevant. See, e.g., Chapman, 666 F.3d at 227 ("As we did when recently considering the as-applied Second Amendment challenge to § 922(g)(9) . . . , we begin our reasonable fit inquiry here

8

by considering the precise contours of" the challenged statute); id. at 228 ("Of critical importance to our reasonable fit analysis is the fact that numerous features of . . . [the challenged statute] keep its prohibitory sweep exceedingly narrow.").  As noted in the court of appeals' decision in this case, section 922(g)(3) is more circumscribed in comparison to some of its section 922(g) counterparts:

> [Section] 922(g)(3) does not permanently disarm all persons who, at any point in their lives, were unlawful drug users or addicts. Instead, it only applies to persons who are currently unlawful users or addicts. This feature of § 922(g)(3) contributes to its proportionality for two reasons.
>
> First, . . . it is less intrusive than other statutes that impose a permanent prohibition on the possession of firearms. . . . Congress tailored the prohibition to cover only the time period during which it deemed such persons to be dangerous.
>
> Second [section] 922(g)(3) tracks the ongoing choices of individuals either to remain drug users or to quit drug abuse. . . . [Section] 922(g)(3) enables a drug user who places a high value on the right to bear arms to regain that right by parting ways with illicit drug use.  Given that the Supreme Court has already signaled that the permanent and virtually irreversible prohibition on firearm possession by convicted felons is "presumptively lawful," we might find it challenging to conclude that the narrower classification set forth in § 922(g)(3) is unlawful.

Carter, 669 F.3d at 418-19.

Third, the court has considered the evidence submitted by the parties on remand.  See Chapman, 666 F.3d at 229 ("Mindful of . . . [the challenged statute's] exceedingly narrow

9

prohibitory sweep, we move on to evaluate the evidence offered by the government in support of its reasonable fit burden."). The United States has submitted studies indicating a connection between drug use and crime. See, e.g., Lana Harrison & Joseph Gfroerer, The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse, 38 Crime & Delinquency 422, 423 (1992) (noting "Research has consistently demonstrated a high degree of correlation between drug use and criminal behaviors" and also observing that "rates of criminal behavior are higher for populations more heavily involved in drug use.") (referencing five different studies respecting the first quoted observation); Dixie J. Koo et al., Violent Victimization and the Routine Activities/Lifestyle of Active Drug Users, 38 J. Drug. Iss. 1105, 1106 (2008) (stating "A substantial portion of the violence today is attributed to drug-trafficking and substance abuse, and criminal victimization associated with substance use is a serious concern.") (referencing four different studies).

In addition to that finding, the available literature indicates a correlation between violent crime in particular and drug use. The Harrison and Gfroerer article noted a 1989 study indicating "that violence is peripherally related to drug abuse." Harrison & Gfroerer, at 424; see also id. at 438 ("Drug

users are . . . more likely to engage in property and violent crime . . . ."). Other sources suggest a tighter link. Bureau of Justice Statistics, U.S. Dep't of Justice, <u>Substance Abuse and Treatment, State and Federal Prisoners</u>, 1997, at 2 (1999) ("1999 BJS Report") ("Among Federal prisoners the reported use of alcohol or drugs at the time of offense showed greater variation by offense type.  Violent offenders reported the highest levels . . . ."). The 1999 BJS Report also observed that "[a] third of State prisoners said they had committed their current offense while under the influence of drugs . . . . [a]nd robbery (40%) [along with drug possession and trafficking] . . . were the most closely tied to drug influence." (<u>Id.</u> at 3).  The BJS Report's findings on marijuana usage were particularly noteworthy given that is Mr. Carter's drug of choice: "Fifty-seven percent of State prisoners said they had used drugs in the month before their current offense, up from 50% in 1991 . . . . [a]nd [t]he use of marijuana in the month before the offense (39%) had increased since 1991 (32%)."  (<u>Id.</u> at 4).  A similar growth rate was seen on the federal side, with the percentage of federal inmates using marijuana while committing their offense growing from 6% to 11% since 1991.  (<u>Id.</u>)

A more recent report from the Bureau of Justice Statistics is of equal, if not greater, concern.  It provides

11

that "half . . . of Federal inmates reported drug use in the month before their offense, up from 45% in 1997." Bureau of Justice Statistics, U.S. Dep't of Justice, <u>Drug Use and Dependence, State and Federal Prisoners, 2004</u>, at 1 (2007) ("2007 BJS Report").  The 2007 BJS Report also noted that "[p]risoners who met the criteria for recent drug dependence or abuse had extensive criminal records."  (<u>Id.</u>)  On the state side, the 2007 BJS Report observed that "forty percent of [inmates] . . . reported using marijuana in the month before their offense, and 15% said they had used marijuana at the time of the offense."  (<u>Id.</u> at 2).  Again, the type of offense is important.  For violent offenders at the state and federal levels, 29% and 24.5% respectively reported that they had used drugs at the time of the offense.

Other literature is also worth mentioning.  One article notes that for violent offenses such as murder, rape, robbery, and aggravated assault, the adults who were arrested for such crimes in the preceding year were more likely to have used an illicit drug during that period than those who were not arrested (63.1% versus 13.7%).  Office of Applied Studies, Substance Abuse and Mental Health Services Administration, <u>Illicit Drug Use Among Persons Arrested for Serious Crimes</u>, (2005).  Another study noted that "Criminals who use illegal

drugs commit robberies and assaults more frequently than do nonuser criminals, and they commit them especially frequently during periods of heavy drug use."  H. Virginia McCoy, et al., Perpetrators, Victims, and Observers of Violence: Chronic and Non-Chronic Drug Users, 16 J. Interpersonal Violence 890, 906 (2001).  The McCoy article also observed a companion study finding "that more than one half of all homicides in New York were drug related . . . . [and] more than half of arrestees booked for violent crimes were confirmed by laboratory tests to have used at least one illegal drug in the hours before their arrest."  Id. at 891.

      As noted, Mr. Carter's drug of choice is marijuana.  Harrison and Gfroerer observed that, as of 1991, "[T]he most prevalent of the illicit drugs [used] was cannabis, with 33.4% prevalence, 9.6% past-year prevalence, and 4.8% past-month prevalence."  Harrison & Gfroerer, at 429.  Studies such as those cited above caused the United States Court of Appeals for the Seventh Circuit to conclude that "Ample academic research confirms the connection between drug use and violent crime."  United States v. Yancey,  621 F.3d 681, 686 (7th Cir. 2010).  Our court of appeals in this case, citing Yancey, appears to have credited that view.  Carter, 669 F.3d at 418 (noting that while "the government . . . chose[] not to rely on academic

research or other empirical data to demonstrate the connection between drug use and gun violence, . . . such evidence is abundantly available.").

Mr. Carter picks around the edges of these studies, but the quoted findings are difficult to dismiss. He cites only one study asserted to "debunk[] the belief that marijuana use is causally related to violent behavior." (Def.'s Memo. at 12-13 (citing Evelyn H. Wei et al., Teasing Apart the Developmental Associations Between Alcohol and Marijuana Use and Violence, 20 J. of Contemp. Crim. Just. (2004)). As is apparent from the earlier recitation of authorities, the weight of the literature is decidedly against the findings of the Wei study.

In his November 16, 2012, filing, Mr. Carter reiterates that the studies concerning drug usage and violence do not produce a strict causal nexus. That is true. As numerous other studies have observed, however, the two factors frequently coincide. Mr. Carter cites no authority for the proposition that Congress may not legislate in a certain manner simply because it cannot conclusively exclude all non-relevant contributing variables when it nevertheless has strong evidence of a link between the regulated variable and the problem sought to be remedied.

Mr. Carter also notes the medical benefits of marijuana use, that it has been "legalized" by the laws of some jurisdictions (though it remains subject to federal criminal penalties), that some of those states do not disarm users, and that other states that do not authorize medical marijuana usage have nevertheless not disarmed users.  There may indeed be legitimate uses for certain controlled substances.  Further, some of those ingesting the drugs may pose no threat at all if possessing a firearm.  That, however, is beside the point.

Mr. Carter's arguments implicitly urge the court to evaluate the comparative wisdom of policy choices made by the identified state and federal legislative bodies.  That evaluation is unnecessary under <u>Chester</u> and its progeny.  Again, Congress need not have achieved a perfect fit between its important objectives and its chosen regulation.  The fit need only be reasonable, and some over-inclusiveness is not only lawful, but entirely expected:

> We also recognize that the prohibitory net cast by § 922(g)(8)(A)-(B) and (C)(ii) may be somewhat over-inclusive given that not every person who falls within in it would misuse a firearm against his own child, an intimate partner, or a child of such intimate partner, if permitted to possess one. This point does not undermine the constitutionality of § 922(g)(8)(A)-(B) and (C)(ii), however, because it merely suggests that the fit is not a perfect one; a reasonable fit is all that is required under intermediate scrutiny.

15

Chapman, 666 F.3d at 231. In sum, the court concludes that the United States' evidentiary showing is compelling and that Mr. Carter has done nothing to diminish its force.

Having considered the text and reach of the statute and the evidence submitted by the United States, it is noteworthy as well that no appellate court has sustained a Heller challenge to section 922(g)(3). See, e.g., United States v. Dugan, 657 F.3d 998 (9th Cir. 2011); Yancey, 621 F.3d at 687 (7th Cir. 2010); United States v. Seay, 620 F.3d 919 (8th Cir. 2010); United States v. Patterson, 431 F.3d 832 (5th Cir. 2005).

Finally, there are, as the panel characterized them in this case, the "plausible" common-sense notions that might support the constitutionality of section 922(g)(3). Carter, 669 F.3d at 419. First, drug users and addicts would reasonably be more likely than other citizens to encounter law enforcement. Adding firearms to those engagements would be expected to significantly increase their dangerousness. Second, one might expect that the criminal associations that result from the drug trade present much greater risks of violence than ordinary commercial exchanges. Third, high prices that accompany illicit drug trafficking lead some desperate addicts to turn to crime to finance their habits. The resulting violent and property crimes are much more ominous from a public safety standpoint when

firearms are involved.  Finally, the impaired judgment that often coincides with controlled substance usage would reliably lead to frequent "irrational and unpredictable behavior" that would only be compounded by a firearm at the ready.  Carter, 669 F.3d at 420.

The panel decision in this case observed that the United States' discharge of its burden "should not be difficult . . . ."  Carter, 669 F.3d at 419.  That forecast has proven accurate.  Based upon the narrowed design of the statute, the empirical and scholarly evidence relied upon, the weight of precedent nationwide, and common sense, the United States has shouldered its burden of establishing that section 922(g)(3) is reasonably fitted to achieve the substantial governmental objective of protecting the community from crime by keeping guns out of the hands of those impaired by their use of controlled substances.  The court, accordingly, concludes that section 922(g)(3) is constitutional as applied to Mr. Carter.[3]

---

[3]  Mr. Carter asserts that his facial challenge is of the overbreadth variety, namely, "that a substantial number of § 922(g)(3)'s applications are unconstitutional, judged in relation to any 'plainly legitimate sweep' the statute may have." (Def.'s Post-Rem. Brf. at 1 n.1).  The question appears to have been resolved adversely to him on appeal.  See Carter, 669 F.3d at 420-21.  The court does not have occasion to revisit the matter in light of the mandate rule.

In his October 6, 2012, post-remand brief, Mr. Carter asserts as follows: "As defendant understands the remand, the Court's original ruling denying his motion to dismiss was vacated, and with it defendant's conviction and subsequent sentence of probation." (Def.'s Br. at 1). That characterization is appropriate. The court, accordingly, ORDERS that a hearing be, and it hereby is, scheduled for December 10, 2012, at 10:00 a.m., with counsel for both parties and Mr. Carter in attendance. The court will first inquire respecting Mr. Carter's intention to remain bound by the plea agreement. In the event Mr. Carter desires to remain bound, and absent any objection, the court will move immediately to disposition using the presentence report and sentencing memoranda previously used by the earlier assigned judge.

The Clerk is directed to forward copies of this written opinion and order to the defendant and all counsel of record.

DATED: November 27, 2012

_____
John T. Copenhaver, Jr.
United States District Judge